UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 07-35-GFVT |
| | ) | |
| V. | ) | |
| | ) | |
| RANDALL THOMPSON, ET AL., | ) | **MEMORANDUM OPINION** |
| | ) | **AND** |
| Defendants. | ) | **ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court upon the Motion for Acquittal Pursuant to Fed. R. Cr. P. 29 and Motion for New Trial Pursuant to Fed. R. Cr. P. 33 [R. 181] filed by the Defendant Ronnie Adams.[1]  The United States has filed a response in opposition [*see* R. 188], and Adams filed a reply [*see* R. 195].  For the reasons set forth below, Adams's Motion will be denied.[2]

**I.**

The four-count Indictment [R. 3] charged Adams and his three co-defendants, Randall Thompson, John "Mac" Combs, and Phillip Champion, as agents of the local Knott County government, with several counts of criminal wrongdoing related to the distribution of county-

---

[1]Adams has also filed motions to join in the arguments raised by each of the other Defendants.  [*See* R. 178, 185, 196.]  The Court will grant those motions and consider the other arguments as if raised by Adams himself.  However, to the extent that Adams has adopted arguments not actually presented in his Motion, those arguments will be denied for the reasons set forth in the Orders addressing his co-Defendants' Motions.

[2]Prior to sentencing the Defendant on February 2, 2009, the Court noted that the Defendants' post-trial motions would be denied by subsequent writing.  This Memorandum Opinion and Order articulates the Court's reasoning and analysis supporting the denial of those motions.

purchased blacktop, gravel, and bridge-building materials as part of an attempt to influence the outcome of an election. The Indictment charged all four Defendants with conspiring to buy votes and misappropriate government property, in violation of 18 U.S.C. § 371. The Defendants were also collectively charged with aiding and abetting each other in the misappropriation of government property, in violation of 18 U.S.C. § 666, while Adams was individually charged with two separate counts of vote buying, in violation of 42 U.S.C. § 1973i(c). Essentially, the Indictment alleged that the Defendants used materials purchased by the government to improve private property and that they did this, by agreement, in exchange for votes for Randy Thompson. As to Mr. Adams, the jury returned guilty verdicts on the conspiracy and misappropriation counts, as well as one of the vote buying counts. [*See* R. 167.] Adams now moves the Court for a Judgment of Acquittal, or in the alternative, a new trial.

**II.**

**A.**

A motion for acquittal pursuant to Fed. R. Crim. P. 29 takes the place of a motion for directed verdict and raises the question of whether the evidence is sufficient to support a verdict. *United States v. Cox*, 593 F.2d 46, 48 (6th Cir. 1979). "When reviewing a claim of insufficient evidence, we examine the evidence in the light most favorable to the government and draw all inferences in the government's favor in order to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *United States v. Johnson*, 71 F.3d 539, 542 (6th Cir. 1995) (citing *United States v. Riffe*, 28 F.3d 565, 567 (6th Cir. 1994)). There is a "strong presumption in favor of sustaining a jury conviction," *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994), and a defendant seeking a judicial reversal of a jury

determination of guilt bears a "very heavy" burden "because the reviewing court does not judge the credibility of witnesses or weigh evidence, and it draws all reasonable inferences in the government's favor." *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005); *see also United States v. Wright*, 16 F.3d 1429, 1439 (6th Cir.), *cert. denied*, 512 U.S. 1243 (1994).

**1.**

Adams argues that there was insufficient evidence to convict him of vote buying. He notes that the complaining witness in Count Three was Bobby Reynolds. Adams contends that Mr. Reynolds's testimony does not establish the requisite quid pro quo. Further, Adams asserts that Rooster Lane, the road on which Mr. Reynolds lives, is actually a public road that was formally adopted into the county road system. Therefore, according to Adams, he could not be convicted for vote buying as it relates to Mr. Reynolds and Rooster Lane.

Here, there is sufficient evidence to support Adams's conviction for vote buying. The government concedes that a road named Rooster Lane was adopted and designated in official records as a county road. However, Mr. Reynolds testified that he personally extended Rooster Lane onto his private property. He specifically stated that he built that portion of the road.

At trial, Mr. Reynolds provided testimony to the effect that he thought the county ought to own his road because of gravel and grading done in the past. This testimony came as a surprise to the government and was inconsistent with his grand jury testimony. Similarly, at trial, Mr. Reynolds also denied that any discussion of votes for blacktop ever occurred. The government then rehabilitated Mr. Reynolds with his prior grand jury testimony. Upon questioning, Mr. Reynolds admitted that he told the grand jury the following:

> . . . [Adams] asked me how everybody'd vote up here – he asked me how's all my family going to vote, and I told him I hadn't asked them, and he said, 'Well, if

3

>I can get it to you to get it – to blacktop you before the election, and I said, 'Well, if you blacktop before the election, every one of them in here will vote for Randy.'

[R. 211, Trial Tr., Vol. 3, pp. 13-14.] Mr. Reynolds confirmed that he made these statements in his prior grand jury testimony. He further testified that the blacktopping subsequently occurred about two weeks prior to the election. Thus, Mr. Reynold's rehabilitated testimony is more than sufficient to establish that a quid pro quo existed. Drawing all inferences in the government's favor, a rational trier of fact could have determined that Adams offered to pave Mr. Reynolds's private driveway in exchange for his and his family's votes for Randy Thompson and that Mr. Reynolds accepted that offer.

Adams also contends that insufficient evidence exists to establish a conspiracy among the parties or an aiding and abetting between the Defendants. He argues that there was substantial evidence of good faith on the part of the Defendants but that the jury apparently failed to consider such evidence despite the Court's instructions to do so.

In this case, there is also sufficient evidence to sustain Adams's conviction for misapplication of government property. As discussed above, the evidence surrounding the offer of blacktop in exchange for votes also supplies substantial evidence of the misapplication of government property. Without recounting all the details, it suffices to say that providing county purchased blacktop on private roads, whether or not in exchange for votes, clearly constitutes the misapplication of government property.

Other testimony at trial established Adams's role in the distribution of blacktop on private property. For example, the Morgan brothers, Jeremy and Jeffrey, testified that Adams called them and asked if they wanted blacktop on their driveway. When Jeremy Morgan asked

4

about the cost of such a project, Adams advised that they would talk about it later. Although their driveway got paved, the Morgans never received a bill or paid for the blacktop. Orvil Pratt testified about a similar experience with Adams. According to Mr. Pratt, Adams directed that the Pratt's driveway be paved while the contractors were near his house. Mr. Pratt stated that both he and his granddaughter had their private driveways paved and that they did not pay for that service. Again, drawing all inferences in favor of the government, there is more than sufficient evidence to support Adams's conviction for misapplication of government property.

**2.**

Adopting the arguments of his co-defendants, Adams maintains that he is entitled to a judgment of acquittal and/or a new trial because the worst evidence against him was totally inadmissible. He asserts that the tape recorded grand jury testimony of Tammy Brewer, a secretary in the Knott County Judge Executive's office, and her father, Hoey Dobson, as well as prior tape recordings made by Detective Marcus Hopkins were inadmissible because neither Brewer nor Dobson testified at trial and no valid exception to the hearsay rule exists. He specifically argues that the statements are not admissible pursuant to the co-conspirator exception to the hearsay rule.

During the relevant investigation, Detective Hopkins interviewed both Ms. Brewer and Mr. Dobson and recorded those conversations. He questioned them about their recently paved driveways. Ms. Brewer advised Agent Hopkins that her father, Hoey Dobson, had paid for the paving and that she had a receipt to prove it. Detective Hopkins subsequently questioned Mr. Dobson, who seemed to have no knowledge about who paved the driveways or who paid for it. Testifying before the grand jury, Ms. Brewer essentially reiterated her prior statements. Mr.

Dobson's memory improved significantly from the time he was first interviewed to when he appeared at the grand jury. His testimony to the grand jury was virtually identical to that of his daughter.

At the trial in this case, the government presented the testimony of Randy Campbell, the man who paved Ms. Brewer's driveway. Campbell testified that he did not receive payment from either Ms. Brewer or Mr. Dobson. He also stated that he was directed to use county materials to pave that driveway and that the receipt, produced at the direction of John "Mac" Combs, was not legitimate. Based in part on the testimony of Campbell, Ms. Brewer and Mr. Dobson were convicted of perjury in a separate case prior to the trial in the instant matter. *See* London Criminal No. 6:07-cr-112-GFVT (E.D. Ky.).

Here, Adams presents a lengthy argument that these statements were inadmissible absent an opportunity for cross-examination. He argues that the Court committed error by admitting the recorded statements and testimony of Ms. Brewer and Mr. Dobson under Rule 801(d)(2)(E), the coconspirator exception to the hearsay rule. His argument is factually misplaced.

The Federal Rules of Evidence define hearsay as an out of court statement offered "to prove the truth of the matter asserted." Fed. R. Evid. 801(c). However, as the Court noted at trial in ruling on the Defendants' objections to the admission these statements, the out-of-court testimony at issue was not offered for its truth. In fact, the point of the government's offering Ms. Brewer's and Mr. Dobson's statements was simply to prove that those statements were made so as to establish a foundation for later showing, through other admissible evidence and testimony, that they were false. *See United States v. Hathaway*, 798 F.2d 902, 905 (6th Cir. 1986). In *Hathaway*, the Sixth Circuit concluded that:

6

> When statements are offered to prove the falsity of the matter asserted, there is no need to assess the credibility of the declarant. Since there is no need to assess the credibility of the declarant of a false statement, we know of no purpose which would be served by extending the definition of hearsay to cover statements offered for the falsity of the matter asserted.

*Hathaway*, 798 F.2d at 905 (citations omitted). Similarly, in *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court specifically acknowledged that the Sixth Amendment "does not bar the use of testimonial statements for purposes *other than* establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59, n.9 (emphasis added) (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)). Thus, when an out-of-court statement is not offered to prove the truth of the matter asserted, as with Brewer's and Dobson's statements, the Confrontation Clause is not implicated. *See Street*, 471 U.S. at 413; *United States v. Martin*, 897 F.2d 1368, 1372 (6th Cir. 1990).

The Court further notes that the admission of these statements was not inherently prejudicial to the Defendants. On their face, these statements did not implicate any of the Defendants in any criminal wrongdoing. Rather, they appear to be efforts by Ms. Brewer and Mr. Dobson to escape or limit their own criminal liability. As noted by the government, the relevance of false exculpatory statements generally relates to a consciousness of guilt. The falsity of these particular statements, as established by the testimony of Randy Campbell, provided evidence that county-purchased materials were being used to improve private property. Accordingly, because these statements were properly admitted into evidence, Adams is not entitled to a judgment of acquittal.

**3.**

Adams next argues that because the particular crime at issue involved paving, it could not

be prosecuted as a conspiracy because its very nature requires the participation of at least two people. He contends that Wharton's Rule precludes a conspiracy charge in this case. His argument is misplaced.

Wharton's Rule, in brief, holds that a defendant cannot be punished for conspiracy and a substantive offense if the substantive offense requires the participation of two persons. *See Iannelli v. United States*, 420 U.S. 770, 773 (1975). The rule traditionally was applied to offenses which by their nature required the acts of more than one person, such as adultery, incest, bigamy, and duelling. *Id.* at 782. In those situations, "the parties to the agreement are the only persons who participate in commission of the substantive offense, and the immediate consequences of the crime rest on the parties themselves rather than on society at large." *Id.* (citation omitted). As the Supreme Court has noted, Wharton's Rule is not grounded in double jeopardy law, but rather "has current viability only as a judicial presumption, to be applied in the absence of legislative intent to the contrary." *Id.*

Wharton's Rule is simply inapplicable to the present case. Adams cannot plausibly argue that the legislative intent concerning the punishment for vote buying and misappropriation is somehow unclear. These offenses are in no way similar to those to which Wharton's Rule has traditionally been applied. Indeed, the substantive offenses of vote buying and misappropriation cause distinct threats to society including the erosion of trust in our government and elected officials, the subversion of our electoral process, and the diminution of votes cast by individual citizens. Thus, the Court concludes that the type of conduct engaged in by these defendants is precisely the type of conduct that the crime of conspiracy is designed to reach, separate and apart from any substantive violations that might be committed. Moreover, as in *Iannelli*, the

agreement connected with the substantive offenses of vote buying and misappropriation poses "the distinct kinds of threats to society that the law of conspiracy seeks to avert." *Id.* at 783. Accordingly, Adams's argument is without merit.

**4.**

Adams contends that other evidence was also improperly admitted. He argues that the government improperly called witnesses for the purpose of eliciting otherwise inadmissible impeachment testimony. Adams vaguely asserts that the government called witnesses, was unable to get them to reiterate a previous statement, and then impeached them. This argument is without merit.

Initially, it is noted that Rule 607 provides that "[t]he credibility of a witness may be attacked by any party, including the party calling him," and Rule 613(b) permits a witness's prior inconsistent statement to be admitted as impeachment evidence, so long as "the witness is afforded an opportunity to explain or deny [the statement] and the opposite party is afforded an opportunity to interrogate the witness . . . ." Fed. R. Evid. 607, 613(b).

In this case, the government did not call witnesses for the sole purpose of impeaching them with otherwise inadmissible evidence. Indeed, the only example cited by Adams involved the government's characterization of the testimony of Robert Graves, the manager of Mountain Enterprises paving company. The government asked Mr. Graves about why his company stopped handling the blacktopping for Knott County during the 2006 election but it did not impeach Mr. Graves with a prior inconsistent statement. Moreover, although not specifically mentioned by Adams, the government did attempt to impeach the testimony of Craner Jacobs and Tom Hays. However, those witnesses were impeached by their prior grand jury testimony.

They were given an opportunity to explain their statements and the Defendants were able to cross-examine them. Because the impeachment involved their grand jury testimony, the witnesses were not impeached with otherwise inadmissible evidence.

**5.**

Adams argues that the Court committed error by failing to identify whether or not any of the Defendants' conduct violated state law. He contends that the jury was required to determine whether a driveway or roadway was public or private. Adams also suggests that the United States cited no authority for the proposition that it is illegal for county employees to pave private driveways or bridges.

Here, the jury was properly instructed on the law concerning the misappropriation charge. In order to find the Defendants guilty, Instruction No. 16 required the jury find that the Defendants "intentionally misapplied more than $5,000 of property *by causing paving contractors and county employees to spread gravel and/or blacktop on private drives and roadways and/or by causing county building materials to be used in the construction of private bridges*." [R. 162, Jury Instructions, p. 21 (emphasis added).] Contrary to the Defendant's arguments, this instruction does define the crime of misapplication. It explains what the jury is required to find in order to determine that the Defendant's conduct was illegal. The instruction characterizes the misapplication of property as the improper use of county materials on private property.

At the Defendants' request, this instruction also included a significant amount of information related to the public versus private distinction as well as ways in which the Defendants could permissibly use government property. For example, Instruction No. 16 goes

10

on to note that placing or using county materials on county property is not a crime. The instruction also provides a description of several ways in which a road or bridge can be deemed public. Finally, the instruction includes a list of public functions that the fiscal court and/or judge executive may perform, including the provision of ambulance service, the construction and maintenance of suitable areas for the safe turning around of school buses, and the provision of appropriate funds to keep all county roads in good repair and free from obstructions.

Despite the inclusion of the many of the Defendants' requested instructions, Adams still suggests that the Court was required to describe a specific violation of state law in the instructions. However, there is no state law prohibiting every conceivable form of misappropriation by county officials. Thus, although there is no state law specifically prohibiting a county official from using county funds to buy himself a new boat, it is beyond cavil to suggest that such an action is not illegal. Indeed, the use of county purchased materials to improve private property is similarly illegal. Accordingly, because the jury instructions correctly defined the crime of misapplication, neither a judgment of acquittal nor a new trial is warranted.

**6.**

In his next argument, Adams contends that he should be acquitted or granted a new trial because federal law has never extended "vote buying" to include as an item of "pecuniary value" the paving of public or private roads. Because these cannot be converted into money, Adams argues that they lack pecuniary value and therefore cannot be the subject of a vote buying conviction.

Initially, the Court notes that this argument was previously raised in pretrial motions.

The Court denied this argument when it was first presented and remains unpersuaded by it now. The federal vote buying statute prohibits an individual from knowingly or willfully paying for votes or attempting to pay for votes. In *United States v. Garcia*, 719 F.2d 99 (5th Cir. 1983), the Fifth Circuit, addressing a vote buying charge concerning the exchange of welfare food vouchers for votes, found that the proscription against "payment" for votes was not limited to those circumstances in which cash if offered or given. *Id.* at 101. The *Garcia* Court examined the relevant case law and the legislative history and concluded that "Congress did not intend to restrict the term 'payment' in § 1973i(c) to offers of money, and that the term was intended to included items of pecuniary value offered or given directly to an individual voter in exchange for his individual vote . . . ." *Id.* at 102.

Again, as noted in the Court's prior order, this analysis applies with equal force in the case at hand. Adams has now been convicted of offering to pave a driveway in exchange for votes. Although Adams contends that paving a driveway does not qualify as an item of pecuniary value, the Court disagrees. At trial, there was significant evidence concerning the cost of paving a driveway. Indeed, such costs are readily determinable if the price and quantity of blacktop are known. Simply put, having one's driveway blacktopped amounts to receiving an item of pecuniary value. Adams's argument is, therefore, without merit.

**7.**

Adams also argues that the Court erred by admitting a video tape of Judge Thompson taken from a television newscast. He adopts Thompson's argument, contending that the admission of the video tape violated the rule of completeness. His argument is without merit.

In this case, the government notified the Court and defense counsel of its intention to

12

play a news clip which aired on television in which Thompson was interviewed by a reporter. As with virtually all news stories, this one was clearly edited. According to Thompson's counsel, the original interview lasted almost thirty minutes. The news clip at issue, however, was only about thirty seconds. The Defendants essentially argued that the rule of completeness barred the admission of the news clip because the other portions of it were unavailable.

Rule 106 of the Federal Rules of Evidence directs that "[w]hen a writing or recorded statement . . . is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." At trial, after hearing argument from counsel, the Court ultimately concluded that the rule of completeness was inapplicable. This was not a situation where the government read a portion of a deposition and the Defendants then sought admission of the entire deposition in order to put the other portion in appropriate context. Although the news clip had been pared down, the government was not in possession of the entire interview. That Thompson may have said something else during the interview does not implicate Fed. R. Evid. 106.

Having concluded that the rule of completeness was inapplicable, the Court determined that the news clip was admissible as a statement of a party opponent. There was no dispute that the statements were made by Thompson. The Court found that the statements, on their face, were not confusing. Further, the Court concluded that the admission of these statements were not unduly prejudicial. In fact, the Court specifically noted that one of the statements appeared to be consistent with Thompson's theory of the case. As the Court also noted, the Defendants were free to ask questions about the editing process and the existence of other portions of the

interview on cross-examination. Accordingly, consistent with its rulings at trial, the Court finds that the admission of the television news clips was not error.

**B.**

Alternatively, Adams contends that a new trial should be ordered pursuant to Fed. R. Crim. P. 33. Rule 33 of the Federal Rules of Criminal Procedure provides that "the court may vacate any judgment and grant a new trial *if the interest of justice so requires*." (emphasis added). The trial court "possesses 'wide discretion' in evaluating a Rule 33 motion and may independently evaluate witness credibility and the weight of the evidence offered at trial." *United States v. Roland*, 233 F. App'x 476, 482 (6th Cir. 2007) (citations omitted). Generally, motions for a new trial are disfavored and should be granted with caution. *See United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991). Indeed, a new trial is appropriate "'only in the *extraordinary circumstances* where the evidence preponderates heavily against the verdict.'" *Roland*, 233 F. App'x at 482 (emphasis added) (citing *United States v. Ashworth*, 836 F .2d 260, 266 (6th Cir. 1988)).

The Court has reviewed the entire record as well as all of the arguments raised by the Defendants and considered them under both standards of review. Having considered witness credibility and the weight of the evidence offered at trial, the Court, in its discretion, finds that this is not an extraordinary circumstance where the evidence preponderates heavily against the verdict. Therefore, the interest of justice does not require granting the Defendants a new trial.

**III.**

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Adams's Motions for Joinder [R. 178, 185, 196] are **GRANTED**;

2. Adams's Motion for Judgment of Acquittal and/or New Trial [R. 181] is **DENIED**.

This the 9th day of February, 2009.

Signed By:
*Gregory F. Van Tatenhove*
United States District Judge